AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

**FILED**

OCT 0 2 2020

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) Case No. 2 0 M J 9 8 0 6 |
| Facebook, Inc., 1601 Willow Road Menlo Park, CA  94025 (Facebook ID 100002128756342) | ) ) ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 952, 960, 963 | Importation of a Controlled Substance; Conspiracy to Commit the Same |

The application is based on these facts:

See Attached Affidavit of HSI Special Agent Jose L. Davila, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Jose L. Davila, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: 9/24/2020

_____
*Judge's signature*

City and state: El Centro, California

Hon. Ruth B. Montenegro, U.S. Magistrate Judge
*Printed name and title*

## **ATTACHMENT A**

### PROPERTY TO BE SEARCHED

The following Facebook, Inc. account:

|  |  |
|---|---|
| Facebook Name: | Monica Retana |
| Facebook ID No.: | 100002128756342 |
| Facebook URL: | www.facebook.com/BeyahLoks |

**(Target Account)**

Facebook, Inc. is an Internet Service Provider with its primary computer information systems and other electronic communications and storage systems, records and data located at 1601 Willow Road, Menlo Park, CA 94025.

## ATTACHMENT B

### ITEMS TO BE SEIZED

**I.**  Service of Warrant

The officer executing the warrant shall permit Facebook, Inc., as custodian of the computer files described in Section II below, to locate the files, copy them onto removable electronic storage media, and deliver the same to the officer.

**II.**  Items to be provided by the ISP

All subscriber, location and/or user information, all electronic communications, images, text messages, histories, phone and VoIP logs, including metadata, contacts or friend lists, profiles, method of payment, detailed billing records, access logs, backup data, transactional data, and any other files or records associated with the following account and screen name:

> Facebook Name:   Monica Retana
> Facebook ID No.: 100002128756342
> Facebook URL:   www.facebook.com/BeyahLoks

**III.**  The search of the data supplied by Facebook, Inc. pursuant to this warrant will be conducted by Homeland Security Investigations, as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited to the period of January 24, 2020 up to and including April 25, 2020, and to the seizure of:

a.   Communications, records, and attachments tending to discuss or establish importation or distribution of controlled substances, or conspiracies or agreements to do so;

b.   Communications, records, and attachments tending to identify locations of narcotics being distributed or imported into the United States;

c.   Communications, records, and attachments tending to identify Monica RETANA, Alyssa TIJERINA, or any co-conspirators in the activities in III(a)-(b) above; and

d.   Communications, records, and attachments that provide context to any communications described above, such as electronic mail sent or received in temporal proximity to any relevant electronic mail and any electronic mail tending to identify users of the subject accounts;

which are evidence of violations of 21 U.S.C. §§ 952, 960, and 963.

**AFFIDAVIT IN SUPPORT OF**

**APPLICATION FOR SEARCH WARRANT**

I, Jose L. Davila, being duly sworn, hereby state as follows:

1.     This affidavit is in support of an application by the United States of America for a search warrant for Facebook, Inc. (Facebook), as described in Attachment A, to search the following Facebook account:

> Facebook Name:    Monica Retana
>
> Facebook ID No.:  100002128756342
>
> Facebook URL:     www.facebook.com/BeyahLoks
>
> (**Target Account**),

for items that constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, Title 21, United States Code, Sections 952, 960, and 963, conspiracy to import and importation of controlled substances, as described in Attachment B (incorporated herein by reference) for the time period from January 24, 2020 to April 25, 2020. This affidavit and application are sought pursuant to Rule 41 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 2703(a) and (b), which applies to providers of electronic communication and remote computing services.

2.     The information contained in this affidavit is based on my personal experience and training, consultation with other special agents and other law enforcement officers. Because this affidavit is submitted for the limited purpose of securing a search warrant as described herein, it does not include every fact known to me concerning this investigation.

**EXPERIENCE & TRAINING**

3.     I am a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI") and have been so employed since June 2018. I am currently assigned to the HSI Office of the Assistant Special Agent in Charge, Contraband Smuggling Group 1, in El Centro, California. Prior to my current employment, I was employed by Customs and

Border Protection ("CBP") from August 2010 to June 2018, where I last served as a Border Patrol Agent assigned to the Ajo, Arizona U.S. Border Patrol Station in the Tucson Sector.

4.    I am a graduate of the Criminal Investigator Training Program and Homeland Security Investigation, Special Agent Training Program at the Federal Law Enforcement Training Center ("FLETC"), Glynco, Georgia.

5.    As a HSI Special Agent, my duties include investigating the illegal importation and trafficking of controlled substances. I have received training in investigating various crimes involving controlled substances, including the importation of controlled substances and controlled substance trafficking. I have also had training in the methods used by the controlled substance traffickers to import and distribute drugs and to operate detailed distribution networks.  Since becoming a HSI Special Agent, I have participated in investigations pertaining to the importation and distribution of controlled substances through the Calexico West, Calexico East, and Andrade Ports of Entries ("POE").  I have also participated in numerous investigations involving the use of social media as a form for coordinating illicit activities. I have participated in the debriefings of multiple individuals who were apprehended at these POEs driving vehicles with controlled substances concealed inside. I also have consulted with local police officers, HSI special agents, and other federal agents with experience investigating the importation of controlled substances through these POEs. Through these investigations, training, and consultations with other HSI special agents, I am familiar with the operations of illegal international drug trafficking organizations ("DTOs") in Mexico.

6.    In the course of my duties, I have been a case agent directing drug-related investigations. I have participated in many aspects of criminal investigations including reviewing evidence and conducting physical and electronic surveillance. I have interviewed defendants while conducting various investigations.  I have gained a working knowledge and insight into the normal operational habits of narcotics traffickers, with emphasis on

1  those who attempt to import narcotics into the United States from Mexico at the Calexico,
2  California POEs.

3       7.     Through the course of my training, investigations, and conversations with
4  other law enforcement personnel, I am aware that is common practice for narcotics
5  smugglers to work in concert with other individuals and to do so by utilizing cellular
6  telephones, pagers, portable radios, and GPS devices to maintain communication and
7  location information with co-conspirators in order to further their criminal activities.  This
8  is particularly true in cases involving distribution amount quantities of controlled
9  substances, such as methamphetamine. Typically, load drivers smuggling controlled
10  substances across the border are in telephonic contact with co-conspirators immediately
11  prior to, during and following the crossing of the narcotic load, at which time they receive
12  instructions on how to cross and where and when to deliver the controlled substance.
13  Narcotics smugglers and their organizations use cellular, digital, and satellite telephones, in
14  part, because these individuals believe law enforcement is unable to track the originating
15  and destination phone numbers of calls placed to and from cellular, digital, and satellite
16  telephones. Narcotics smugglers also use social media as a means of communicating before,
17  during, and after importing controlled substances into the United States because they
18  believe that law enforcement is unable to access or recover such communications.

19       8.     In preparing this affidavit, I have conferred with other agents and law
20  enforcement personnel who are experienced in the area of narcotics investigations.  The
21  facts and conclusions set forth in this affidavit are based on my own personal knowledge;
22  knowledge obtained from other individuals during my participation in this investigation;
23  my review of documents and records related to this investigation; communications with
24  others who have personal knowledge of the events, details, and circumstances described
25  herein; and information gained through my training, experience, and communications with
26  colleagues. Because this affidavit is submitted for the limited purpose of establishing
27  probable cause in support of the application for a search warrant, it does not set forth each

28

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

-3-

1  and every fact that I or others have learned during the course of this investigation. Dates,
2  times, and amounts are approximate. This training and experience form the basis for
3  opinions I express below.

## FACEBOOK, INC.

5      9.     Facebook, Inc. is an Internet company that, among other things, provides
6  electronic communication services to its subscribers. Facebook's electronic
7  mail/communication service allows Facebook subscribers to communicate and share with
8  other Facebook subscribers and with others through the Internet. Facebook subscribers
9  access Facebook's services through the Internet.

10      10.     Subscribers to Facebook use screen names during communications with
11  others. The screen names may or may not identify the real name of the person using a screen
12  name. Although Facebook requires users to subscribe for a free Facebook account,
13  Facebook does not verify the information provided by the Facebook subscriber for its free
14  services.

15      11.     At the creation of a Facebook account and for each subsequent access to the
16  account, Facebook logs the Internet Protocol (IP) address of the computer accessing the
17  account. An IP address is a unique address through which a computer connects to the
18  Internet. IP addresses are leased to businesses and individuals by Internet Service Providers.
19  Obtaining the IP addresses that have accessed a Facebook account often identifies the
20  Internet Service Provider that owns and has leased that address to its customer. Subscriber
21  information for that customer then can be obtained using appropriate legal process.

22      12.     Facebook owns and operates a free-access social networking website of the
23  same name that can be accessed at http://facebook.com Facebook allows its users to
24  establish accounts with Facebook, and users can then use their accounts to share written
25  news, photographs, videos, and other information with other Facebook users, and
26  sometimes with the general public.

13.     Facebook asks users to provide basic contact and personal identifying information to Facebook either during the registration process or thereafter.   This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

14.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group.   A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" and a "News Feed," which highlights the information about the user's "Friends", such as profile changes, upcoming events, and birthdays.

15.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

16.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.   Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and

1  guest list. In addition, Facebook users can "check in" to particular locations or add their
2  geographic locations to their Facebook posts, thereby revealing their geographic locations
3  at particular dates and times. A particular user's profile page also includes a "Wall," which
4  is a space where the user and his or her "Friends" can post messages,
5  attachments, and links that will typically be visible to anyone who can view the user's
6  profile.

7     17.   Facebook allows users to upload photos and videos, which may include any
8  metadata such as location that the user transmitted when s/he uploaded the photo or video.
9  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or
10  video. When a user is tagged in a photo or video, he or she receives a notification of the tag
11  and a link to see the photo or video. For Facebook's purposes, the photos and videos
12  associated with a user's account will include all photos and videos uploaded by that user
13  that have not been deleted, as well as all photos and videos uploaded by any user that have
14  that user tagged in them.

15     18.   Facebook users can exchange private messages on Facebook with other users.
16  These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox"
17  on Facebook, which also stores copies of messages sent by the recipient, as well as other
18  information.  Facebook users can also post comments on the Facebook profiles of other
19  users or on their own profiles; such comments are typically associated with a specific
20  posting or item on the profile.  In addition, Facebook has a Chat feature that allows users to
21  send and receive instant messages through Facebook. These chat communications are stored
22  in the chat history for the account.  Facebook also has a Video Calling feature, and although
23  Facebook does not record the calls themselves, it does keep records of the date of each call.

24     19.   If a Facebook user does not want to interact with another user on Facebook,
25  the first user can "block" the second user from seeing his or her account.

26     20.   Facebook has a "like" feature that allows users to give positive feedback or
27  connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well

28

AFFIDAVIT IN SUPPORT OF APPLICATION    -6-
FOR SEARCH WARRANT

as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

21.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

22.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

23.    Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

24.    The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

25.    Facebook also has a Marketplace feature, which allows users to post free classified ads.    Users can post items for sale, housing, jobs, and other items on the Marketplace.

26.    In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

27.    Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

-7-

the user's profile:  profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

28. Facebook also retains Internet Protocol (IP) logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

29. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

30. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues

relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

31.    As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In your affiant's training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the

Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

32.    Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

33.    Moreover, Facebook users that are not friends are generally not precluded from communicating with one another.  Depending on a user's specific settings, certain aspects of a Facebook profile may be publicly viewable, while other portions may be restricted to certain persons or friends of the Facebook user's accounts.  These so-called "privacy" settings are set by each individual user.  Based on my experience, not every Facebook accounts is by default restricted from public access.  And while users can post messages and comments on other users' Facebook pages, Facebook also allows a private messaging function wherein messages are shared only between the users that are part of that conversation or messaging thread.

34.    Base on my training and experience, Facebook Messenger is a cellphone app created by Facebook, Inc. to enable text-based and audio communications between Facebook users.  Facebook users utilize their Facebook logins to access their accounts and to communicate with their Facebook friends or other Facebook users much the same way a Facebook user can communicate with other users on the Facebook website.

## STATEMENT OF PROBABLE CAUSE

### Monica RETANA's and Alyssa Nicole TIJERINA's Arrest on April 25, 2020

35.    On April 25, 2020 at approximately 4:35 p.m., Monica RETANA (RETANA) and Alyssa Nicole TIJERINA (TIJERINA) attempted to enter the United States at the

Calexico, California East Port of Entry. RETANA was the driver of a gray 2015 Nissan Sentra bearing California license plates 8NXD422. During the primary inspection, RETANA and TIJERINA presented valid U.S. passports bearing their names to facilitate their entry into the United States. Customs and Border Protection Officer (CBPO) Clariza received a negative oral customs declaration from RETANA and TIJERINA. During the query of law enforcement databases CBPO Clariza observed a computer-generated alert and opted to refer the vehicle to Vehicle Secondary (VS) inspection lot.

36. CBPO Perez who was assigned to the VS lot obtained a negative oral customs declaration from RETANA and TIJERINA. RETANA told CBPO Perez that she and TIJERINA were returning from Mexicali where they visited a friend and were traveling back home to Whittier, California.

37. CBPO Perez conducted a 7-point vehicle inspection of RETANA's vehicle and subsequently requested that a Canine Enforcement Officer (CEO) Cardenas screen the vehicle with his assigned Human Narcotics Detector Dog (HNDD). CEO Cardenas' assigned HNDD alerted to the floor of the vehicle.

38. Further inspection of the vehicle revealed thirty-three (33) packages concealed inside a non-factory compartment within the floor of the vehicle. The packages field tested positive for the properties of methamphetamine. The total weight of the packages was approximately 51.58 kilograms (113.71 pounds).

39. RETANA and TIJERINA were arrested for violating Title 21 United States Code, Sections 952 and 960, Unlawful Importation of a Controlled Substance. RETANA and TIJERINA were subsequently released and issued a Notice to Appear and their first appearance is scheduled for November 2, 2020, before the Honorable Ruth B. Montenegro in El Centro, California.

**RETANA's Statement**

40. On April 25, 2020, at approximately 9:12 p.m., RETANA was advised of her *Miranda* rights and elected to make a statement without the presence of an attorney.

1   RETANA stated that she was the registered owner of the vehicle and that she had owned

2   the vehicle since approximately January 2020. RETANA denied knowledge of the

3   contraband found in her vehicle and stated that while she was in Mexico she kept possession

4   of the vehicle at all times and no one else drove the vehicle. RETANA told agents she had

5   not done any repair work to vehicle.

6       41.     RETANA claimed the purpose of her trip to Mexico was to visit friends, and

7   that her friend TIJERINA was accompanying her. RETANA stated she drove directly from

8   the U.S.-Mexico border to a friend's house but declined to give the name of the friend.

9   RETANA subsequently requested an attorney and questioning stopped.

10      42.     At the time of her arrest, RETANA was in possession of one cellular phone.

11      43.     On May 7, 2020, I applied for, and Magistrate Judge Ruth B. Montenegro

12   signed a warrant authorizing to the search of the cellular phone seized from RETANA. *See*

13   20MJ9145.

14      44.     The phone seized from RETANA was PIN locked and not supported for PIN

15   bypass or forensic extraction. The phone was unable to be downloaded.

16   **TIJERINA's Statement**

17      45.     On April 25, 2020, at approximately 9:57 p.m., TIJERINA was advised of her

18   *Miranda* rights and elected to make a statement without the presence of an attorney.

19   TIJERINA stated she was accompanying RETANA to visit RETANA's friends in Mexicali.

20   TIJERINA stated that upon crossing into Mexico, RETANA said she was going to get

21   repairs done on the vehicle and drove to a convenience store where they met with two

22   unknown males who arrived aboard a Sport Utility Vehicle (SUV). TIJERINA told agents

23   that RETANA surrendered the vehicle to one of the unknown males who subsequently

24   drove away with RETANA's vehicle. TIJERINA stated herself and RETANA boarded the

25   SUV and waited in a parking lot. Subsequently, the vehicle was returned to RETANA and

26   they drove straight to the Calexico East POE. TIJERINA stated they never went to a house

27   like RETANA had claimed, and RETANA did not pay the unknown male for the repairs.

28   AFFIDAVIT IN SUPPORT OF APPLICATION         -12-
     FOR SEARCH WARRANT

46.     At the time of her arrest, TIJERINA was in possession of one cellular phone, which she gave agents consent to search.

**Further Investigation**

47.     Based upon my experience investigating narcotics traffickers and the particular investigation in this case, I believe RETANA and other co-conspirators were engaged in a conspiracy to smuggle narcotics into the United States from Mexico.  I also believe the co-conspirators, including RETANA, used cellular phones to communicate and coordinate the importation of narcotics.  Specifically, I believe that RETANA used the Facebook application installed on the cellular phone seized from her at the time of her arrest to communicate with her co-conspirators about the drug smuggling activities.  As indicated above, the phone seized from RETANA at the time of arrest was PIN locked and unable to be forensically downloaded.

48.     The consent download of TIJERINA's cellular phone revealed communication with RETANA via Facebook Messenger. The download of TIJERINA's phone was not able to recover all the data from Facebook Messenger, specifically communications with the **Target Account**. Based on TIJERINA's phone download review, I believe other communications between RETANA, TIJERINA, or other co-conspirators may exist in the **Target Account**.  Additional data that may exist in the **Target Account** and may be available in Facebook Messenger, such as audio messages, photos, videos, locations, contacts, and attached files, which could reveal communications relevant to this investigation.

49.     I know that narcotics trafficking activities entail intricate planning to successfully evade detection by law enforcement. This planning often includes coordination on crossing the border to develop a crossing history or pattern. In my professional experience, narcotics trafficking activities involve planning and coordination in the weeks and often the months prior to the event. Additionally, co-conspirators are often unaware of

1  the subject's arrest and will continue to attempt to communicate with the subject after the
2  arrest to determine the whereabouts of their cargo.

3       50.  In this case RETANA is the registered owner of the vehicle and registered the
4  vehicle under her name on January 24, 2020.  The vehicle exited into Mexico through the
5  Calexico West Port of Entry on January 25, 2020, and did not return into the United States
6  until RETANA first crossed aboard the vehicle from Mexico on March 13, 2020.  RETANA
7  had another crossing on April 11, 2020, before being arrested on April 25, 2020.
8  RETANA's travel pattern and short trips to Mexico aboard the vehicle is consistent with
9  the tactic employed by DTOs to establishing a crossing history often referred to as "burning
10 plates."  Additionally, RETANA and TIJERINA provided inconsistent stories about their
11 trip to Mexicali.

12      51.  As stated above, a forensic download of TIJERINA's cellular phone shows
13 messages received from the **Target Account** prior to their arrest.  Based on my training,
14 experience, and this investigation, I believe communications between RETANA,
15 TIJERINA, and other co-conspirators may exist in the **Target Account**.

16      52.  Additionally, it is believed that the records are still available to Facebook as a
17 request to preserve **Target Account** was made under 18 U.S.C § 2703(f).

18                  **PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

19      53.  The United States is unaware at this time of other attempts by the U.S.
20 government to obtain this data by other means.

21                  **PROCEDURES FOR ELECTRONICALLY STORED**
22                            **INFORMATION**

23      54.  Federal agents and investigative support personnel are trained and experienced
24 in identifying communications relevant to the crimes under investigation.  The personnel of
25 Facebook are not.  It would be inappropriate and impractical for federal agents to search the
26 vast computer network of Facebook for the relevant accounts and then to analyze the

27
28

1   contents of those accounts on the premises of Facebook.   The impact on Facebook's

2   business would be disruptive and severe.

3       55.   Therefore, I request authority to seize all content, including profile contact

4   information, mini-feed, status update history, shares, notes, wall postings, friends listing

5   with friend's Facebook ID, group listing with Facebook Group ID, future and past events,

6   and video listings with filename; User Photos (referred to as User Photoprint); Geo-tags;

7   Group Information; Private Messages; IP Logs; and any other content from the Facebook

8   accounts, as described in Attachment B. In order to accomplish the objective of the search

9   warrant with a minimum of interference with the business activities of Facebook, to protect

10   the rights of the subject of the investigation and to effectively pursue this investigation,

11   authority is sought to allow Facebook to make a digital copy of the entire contents of the

12   account(s) subject to seizure.   That copy will be provided to me or to any authorized federal

13   agent.   The copy will be imaged and the image will then be analyzed to identify

14   communications and other electronic records subject to seizure pursuant to Attachment B.

15   Relevant electronic records will be copied to separate media.   The original media will be

16   sealed and maintained to establish authenticity, if necessary.

17       56.   Analyzing the data to be provided by Facebook may require special technical

18   skills, equipment, and software.   It may also be very time-consuming.   Searching by

19   keywords, for example, often yields many thousands of "hits," each of which must be

20   reviewed in its context by the examiner to determine whether the data is within the scope

21   of the warrant.   Merely finding a relevant "hit" does not end the review process.   Keyword

22   searches do not capture misspelled words, reveal the use of coded language, or account for

23   slang.   Keyword searches are further limited when electronic records are in or use foreign

24   languages. Certain file formats also do not lend themselves to keyword searches.   Keywords

25   search text.   Many common electronic mail, database and spreadsheet applications, which

26   files may have been attached to electronic mail, do not store data as searchable text.   Instead,

27   such data is saved in a proprietary non-text format. And, as the volume of storage allotted

28

by service providers increases, the time it takes to properly analyze recovered data increases dramatically. The ISPs do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

57.   Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months.  Keywords need to be modified continuously based upon the results. The personnel conducting the segregation and extraction of data will complete the analysis and provide the data authorized by this warrant to the investigating team within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

58.   Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails that identify any users of the subject account(s) and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

59.   All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## CONCLUSION

60.     Based on the foregoing, there is probable cause to believe that the items identified in Attachment B have been used in the commission of a crime and constitute evidence, fruits, and instrumentalities of violations of Title 21, United States Code, §§ 952, 960, and 963 and that the foregoing will found at the premises to be searched as provided in Attachment A.

_____

Special Agent Jose L. Davila

Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this *24th* day of *September*, 2020.

_____

HON. RUTH B. MONTENEGRO

U.S. MAGISTRATE JUDGE

AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT

-17-

## ATTACHMENT A

PROPERTY TO BE SEARCHED

The following Facebook, Inc. account:

> Facebook Name:   Monica Retana
>
> Facebook ID No.:  100002128756342
>
> Facebook URL:    www.facebook.com/BeyahLoks
>
> (**Target Account**)

Facebook, Inc. is an Internet Service Provider with its primary computer information systems and other electronic communications and storage systems, records and data located at 1601 Willow Road, Menlo Park, CA 94025.

## ATTACHMENT B

ITEMS TO BE SEIZED

**I.**   Service of Warrant

The officer executing the warrant shall permit Facebook, Inc., as custodian of the computer files described in Section II below, to locate the files, copy them onto removable electronic storage media, and deliver the same to the officer.

**II.**   Items to be provided by the ISP

All subscriber, location and/or user information, all electronic communications, images, text messages, histories, phone and VoIP logs, including metadata, contacts or friend lists, profiles, method of payment, detailed billing records, access logs, backup data, transactional data, and any other files or records associated with the following account and screen name:

> Facebook Name:   Monica Retana
> Facebook ID No.:   100002128756342
> Facebook URL:   www.facebook.com/BeyahLoks

**III.**   The search of the data supplied by Facebook, Inc. pursuant to this warrant will be conducted by Homeland Security Investigations, as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited to the period of January 24, 2020 up to and including April 25, 2020, and to the seizure of:

a.   Communications, records, and attachments tending to discuss or establish importation or distribution of controlled substances, or conspiracies or agreements to do so;

b.   Communications, records, and attachments tending to identify locations of narcotics being distributed or imported into the United States;

c.   Communications, records, and attachments tending to identify Monica RETANA, Alyssa TIJERINA, or any co-conspirators in the activities in III(a)-(b) above; and

d.   Communications, records, and attachments that provide context to any communications described above, such as electronic mail sent or received in temporal proximity to any relevant electronic mail and any electronic mail tending to identify users of the subject accounts;

which are evidence of violations of 21 U.S.C. §§ 952, 960, and 963.